Kate Mueting (D.C. Bar No. 988177)
Shannon Henris (D.C. Bar No. 90017882)
(*pro hac vice* applications forthcoming)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206
kmueting@sanfordheisler.com

Charles Field (CA Bar No. 189817)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 577-4252
cfield@sanfordheisler.com

Kristi Stahnke McGregor (GA Bar No. 674012)
(*pro hac vice* application forthcoming)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7008
kmcgregor@sanfordheisler.com

Susannah R. Cohen (NY Bar No. 6048102)
(*pro hac vice* application forthcoming)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
17 State Street, 37th Floor
New York, NY 10004
Telephone: (646) 402-5646
scohen@sanfordheisler.com

*Attorneys for Plaintiffs Diana Ye and Brian Kurtz,*
*on behalf of themselves and all others similarly situated*

Case No. 3:25-cv-9501

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTHERN CALIFORNIA**

| | |
|---|---|
| DIANA YE and BRIAN KURTZ, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>X CORP., f/k/a/ TWITTER, INC., X HOLDINGS CORP., X.AI HOLDINGS CORP., ELON MUSK, Does,<br><br>          Defendants. | Case No. 3:25-cv-9501<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1.     Plaintiffs Diana Ye and Brian Kurtz, individually, on behalf of the Twitter Severance Plan (the "Severance Plan" or "Plan") and on behalf of a class of similarly situated Plan participants and beneficiaries, bring this action for the recovery of owed severance benefits and relief from fiduciary violations pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

2.     Twitter Inc. ("Twitter")[1] maintained a policy and practice of paying regular severance benefits for many years. On information and belief, since at least 2019, Twitter formalized this policy in several documents that provide a uniform and detailed policy framework for the numerous post-termination benefits Twitter provided to employees. The administration of this plan was ongoing for many years and was effectuated by teams of employees from several departments within Twitter, as well as by contracts with third parties. By operating a severance

---

[1] Simultaneous to the events described in this complaint, Defendant X Corp., a wholly owned subsidiary of Defendant X Holdings Corp., became successor in interest to the company formerly known as Twitter Inc. and assumed all of Twitter Inc.'s debts and obligations. The company and social media service formerly known as Twitter then changed its name to "X." For clarity and consistency, this complaint uses the name Twitter to describe the social media company and platform for which Plaintiffs and members of the potential class worked.

Case No. 3:25-cv-9501

1  plan requiring ongoing maintenance and administration, Twitter was operating an employee

2  welfare benefit plan, as defined in 29 U.S.C. § 1002(1)(A).

3      3.    The Plan fiduciaries, as that term is defined in 29 U.S.C. § 1002(21)(A), include

4  Twitter (and its successor company, X Corp., its parent, X Holdings Corp., and, on information

5  and belief, the parent company of X Holdings Corp., X.AI Holdings Corp.); Elon Musk who, as

6  sole owner and CEO of Twitter during the events of this case, exercised complete control and

7  discretion over the Plan, managed the Plan, and directed communications to employees about it.

8  The Doe Defendants were also Plan fiduciaries as they communicated with Plan participants about

9  the Plan and, on information and belief, exercised control and discretion over it.

10     4.    As Defendant Musk assumed control of Twitter, he and other fiduciaries engaged

11 in a campaign of deception towards employees regarding the existence of the Twitter Severance

12 Plan and employees' eligibility for severance benefits. Without providing any notice to

13 participants, and at times affirmatively misleading them, Defendant Musk and the other

14 Defendants caused the Plan to be deprived of its funds and benefit components. When Defendant

15 Musk and the other Defendants then began a course of mass terminations, Plan participants were

16 wrongfully denied the benefits to which the Plan entitled them, some of which Defendants had

17 promised and were obligated to provide. The result of Defendants' conduct was the wrongful

18 denial of benefits to participants and a Plan that had been disregarded, with benefits accruing to

19 the company and Defendant Musk rather than participants.

20                          **THE PARTIES**

21     5.    Plaintiff Diana Ye was a Plan participant and a Twitter employee from November

22 30, 2021 through her separation date of January 4, 2023. Plaintiff Ye was a Level-4/Level-5 Data

23 Analyst. She worked in San Francisco, California and currently resides in Cumming, Georgia.

24 Plaintiff Ye was informed of her termination on November 4, 2022.

25     6.    Plaintiff Brian Kurtz was a Plan participant and a Twitter employee from March

26 30, 2020 through his separation date of January 4, 2023. Plaintiff Kurtz was a Level-5/Level-6

27 Senior Engineering Technical Program Manager. He worked in San Francisco, California and

28

currently resides in Oakland, California. Plaintiff Kurtz was informed of his termination on November 4, 2022.

7.     Defendant X Corp. is a Nevada corporation and the successor to Twitter, Inc., a Delaware corporation, by merger. X Corp. succeeded to all of Twitter, Inc.'s obligations upon the merger. On information and belief, X Corp. is headquartered at Twitter's former headquarters in San Francisco, California. X Corp. serves as sponsor, administrator, and fiduciary of the Plan. X Corp. is a wholly owned subsidiary of X Holdings Corp., also referred to as X Holdings.

8.     Defendant X Holdings Corp. is a Nevada corporation and the successor to X Holdings I, Inc., which facilitated the merger of X Corp. with Twitter by serving as the parent corporation to the acquisition subsidiary. X Holdings Corp. succeeded to all of X Holdings I's obligations, including its obligations under the April 25, 2022 Merger Agreement between Defendant Musk and Twitter (the "Merger Agreement").

9.     Defendant X.AI Holdings Corp. is a Nevada corporation and, on information and belief, acquired X Holdings Corp. X.AI Holdings Corp. succeeded to all of X Holdings Corp.'s obligations, including its obligations under the Merger Agreement. This included the obligation to maintain and administer the Twitter Severance Plan. Accordingly, X.AI Holdings Corp. is a sponsor, administrator, and fiduciary of the Plan.

10.     Ownership of Twitter was transferred to Defendant Elon Musk on October 27, 2022.

11.     As sole owner and CEO, Defendant Musk exercised discretion and control over the Twitter Severance Plan and was thus a functional fiduciary of the Plan.

12.     Because Plaintiffs are currently unaware of the full scope of identities of the other individuals who had fiduciary duties to Plan participants, those individuals (who may include formal employees of Twitter or informal advisors to Defendant Musk) are collectively named as Defendants Does. Plaintiffs will substitute the real names of Does when they become available to Plaintiffs.

**JURISDICTION, VENUE, AND STANDING**

13.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and 1132(a)(3).

14.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where at least one of the alleged breaches took place. It is also the District in which Defendants Twitter and X Holdings Corp. reside.

15.     As Plan participants, Plaintiffs bring this suit under 29 U.S.C. § 1132(a)(2) and (a)(3) in a representative capacity on behalf of the Plan and all Plan participants.

16.     Plaintiffs have standing to bring claims on behalf of all participants in the Plan because the alleged harms to Plan participants can be traced to the same challenged conduct: refusal to pay benefits due under the Plan to terminated employees, Defendants' purposeful mismanagement of the Plan, and Defendants' deceitful treatment of the Plan participants.

**FIDUCIARY STANDARDS**

17.     ERISA provides that in the absence of a designated plan "Administrator," the employer is an administrator and fiduciary. *See* 29 U.S.C. § 1002(16)(A); ERISA § 3(16)(A).

18.     Twitter, as the employer sponsor of the Severance Plan, was an administrator and fiduciary of the Plan.

19.     ERISA also provides that individuals who perform fiduciary functions are fiduciaries. People are fiduciaries to the extent they "exercise any discretionary authority or discretionary control respecting management of such plan" or have "any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

20.     Each of the Defendants were fiduciaries with respect to the Plan and its participants because they exercised discretionary authority or control over the management of the Plan and/or were involved in its administration.

21.     Defendant Musk and the other Defendants made decisions about the size and

1  availability of Plan disbursements, and which and how many employees would be eligible for

2  them.

3         22.     Defendant Musk and the other Defendants communicated with employees about

4  the availability of severance.

5         23.     By virtue of these actions, as well as their roles within Twitter, Defendant Musk

6  and the Doe Defendants exercised discretionary authority or control respecting the management,

7  control, and administration of the Plan and its assets.

8         24.     As set forth above, the Defendants acted in a fiduciary capacity with respect to the

9  Plan: by administering the Plan, making decisions regarding employees' eligibility for benefits

10 under the Plan, and communicating with employees about the Plan.

11        25.     As set forth here, the Defendants violated their fiduciary duties in several ways.

12        26.     These violations of fiduciary duties caused substantial harm to the Plan and its

13 participants, by causing the Plan to be deprived of the funds necessary to make full payments to

14 Plan participants and by denying participants non-monetary transition services.

15        27.     Defendants are personally and jointly and severally liable for the harm to the Plan

16 and to Plan participants that resulted from Defendants' breaches of their fiduciary duties.

17                              **FACTUAL BACKGROUND**

18  **A.     Twitter Maintained an ERISA Plan**

19        28.     On information and belief, since at least 2019, Twitter maintained a severance plan

20 for the purpose of providing employee participants with certain benefits in the event of

21 unemployment, also known as an employee welfare benefit plan. *See* 29 U.S.C § 1002(1).

22 Accordingly, Twitter engaged in an ongoing policy and practice of providing severance benefits

23 to eligible employees since at least 2019.

24        29.     Plaintiffs Kurtz and Ye learned of allegations related to the Twitter Severance Plan

25 upon reading the amended complaint in *McMillian, et al. v. Musk, et al.*, No. 3:23-cv-03461 (N.D.

26

27

28

Cal. 2023).[2]  Many of the allegations in this complaint relating to the Twitter Severance Plan are based on those publicly reported allegations.

30.    On information and belief, this plan was detailed in company-created Plan documents, which represented the formalization of a longstanding company policy of providing post-termination benefits to departing employees.

31.    On information and belief, one of these Plan documents was a Plan Matrix, which Twitter used to determine an employee's eligibility for severance, and the amount and type of severance an eligible employee would receive.

32.    Whether an employee was eligible for severance and the amount and type of severance an eligible employe would receive was dependent on several factors, including the reason for the departure, an employee's tenure at the company, job level, department, restricted stock unit (RSU) issuance and price of RSUs at the time of departure, whether the employee's departure entailed any legal risk for the company, and other factors.

33.    The types of benefits included payments based on employee salary, tenure, job level, department, and, importantly, reason for and circumstances of departure; a payment for health insurance continuation; pro-rated bonuses for certain types of employees; payments for RSUs; and outplacement services.

34.    As described in allegations in a prior lawsuit, the Plan consisted of several distinct separation scenarios, each of which implicated a separate set of criteria of parameters based on the employee's role in the company and eligibility for different severance components. In turn, each of these severance components contained separate criteria based on an employee's tenure and levels, as well as the specific information about each employee's participation in company health, bonus, and equity programs.

35.    The Plan also included multiple discretionary components and provided that each package be individually assessed and adjusted based on a determination of litigation risk, reason

---

[2] On October 16, 2025, Plaintiffs Courtney McMillian and Ronald Cooper moved to dismiss their appeal in the Ninth Circuit. *See McMillian, et al. v. Musk, et al.*, No. 24-5045, Dkt. 57 (9th Cir. Oct. 16, 2025). Plaintiffs intend to file an Administrative Motion to Consider Whether Cases Should be Related pursuant to Local Rule 3-12.

Case No. 3:25-cv-9501

1    for departure, and "other factors." Outplacement services to departing employees were provided

2    on an ongoing basis through a third-party service provider and the duration of this service

3    depended on an employee's level at the time of separation, as did Twitter's contribution for

4    continued healthcare coverage.

5        36.    A further component of the Plan came in the form of a payout for Restricted Stock

6    Units (RSUs) issued to employees as part of their compensation. Terminated employees were

7    entitled to the value of any RSUs that vested according to their regular schedule for a period of

8    three to six months following termination, depending on employee level. The value of each RSU

9    was set according to an average price at the time of separation.

10       37.    As described in allegations in a prior lawsuit, Twitter tasked several Human

11   Resource employees with applying the Matrix to departing employees, including former Head of

12   People Experience, Courtney McMillian. These employees created and used templates and

13   spreadsheets to process claims for benefits under the Plan.

14       38.    Twitter employees from some other departments were involved in applying the

15   Matrix to departing employees, assessing their eligibility, applying the factors contained in the

16   Matrix, and ensuring that the payments and services set forth in the Matrix were provided to

17   departing employees.

18       39.    Internal procedures existed for amending the Twitter Severance Plan and Plan

19   documents, including the Matrix. These amendments required senior leadership approval and

20   occurred numerous times since 2019.

21       40.    Twitter's administration of the Plan required regular, ongoing expenses of company

22   funds and an ongoing administrative scheme.

23       41.    The Plan was in effect for the entire duration of Plaintiffs' employment with Twitter

24   and was in effect as of October 2022, when Defendant Musk acquired the company.

25       42.    In the days, weeks, and months before Defendant Musk's takeover, Twitter assured

26   employees that severance benefits would continue and that employees who stayed on through the

27   takeover would receive them in the event of layoffs. To this end, Twitter published company-wide

28

"Acquisition FAQs" summarizing some components of the Twitter Severance Plan in April, June, and October 2022. Twitter also sent a company-wide email in May 2022 summarizing the Plan.

43.     Twitter executives made similar promises in company-wide, all-hands meetings throughout this time.

**B.     Twitter and Defendant Musk Informed Plan Participants that the Severance Benefits Would Remain Post-Merger**

44.     On April 25, 2022, Defendant Musk and Twitter announced they had entered into a Merger Agreement, under which Defendant Musk agreed to purchase Twitter. The merger was set to close in October 2022.

45.     Section 6.9 of the Merger Agreement provided that for one year following the closing of the merger, Twitter would continue to provide Plan participants with "Severance payments and benefits . . . no less favorable than" those provided under Twitter's policies immediately prior to the merger.

46.     The same day the Merger Agreement was announced, Twitter's then-CEO, Parag Agrawal and its then-Chairman Bret Taylor met with all Twitter employees and informed them that the Merger Agreement required Twitter to continue to provide Twitter Severance Plan benefits for at least one year following the change in company ownership.

47.     These same promises were made publicly in a letter, also filed with the Securities and Exchange Commission, to Twitter stockholders encouraging them to approve the Merger Agreement.  Referring to "Twitter benefit plans," this document explained that "[d]uring the one year period following the effective time of the merger, Parent [X Holdings] will, or will cause the surviving corporation [X Corp.] or any of their affiliates to, provide severance payments and benefits to each continuing employee that are no less favorable than those applicable to the continuing employee immediately prior to the effective time of the merger under the existing arrangements providing compensation or employee benefits." The letter also explained that any vested RSUs would immediately convert into payments of $54.20—Defendant Musk's offer price—while any unvested RSUs would convert "into the right to receive an amount in cash" equal to Defendant Musk's offer price, which would "vest and be payable" according to the same

schedule as applied immediately prior to the merger.

48.    On information and belief, in response to employee inquiries regarding the continued administration of severance benefits, Twitter created the first "Acquisition FAQs" document, which the company distributed to employees in April 2022.

49.    On information and belief, Defendant Musk approved the Acquisition FAQ, which summarized components of the Twitter Severance Plan, and its distribution to employees.

50.    The company regularly updated the Acquisition FAQs document with information about the merger, including details about and promises to continue existing severance benefits. These updates were distributed to employees with Defendant Musk's approval.

51.    The October 2022 Acquisition FAQs encouraged employees to rely on communications from the company and Defendant Musk for information about the merger and future company policy.

52.    The Acquisition FAQs expressly cited, quoted, and referred employees to Section 6.9 of the Merger Agreement, stating that the section "provide[d] special protection for Tweep [Twitter employee] compensation and benefits for one year following the close of the transaction." The Acquisition FAQs went on to state: "Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will . . . Provide continuing Tweeps whose employment [is] terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction." This language is the same as Section 6.9 of the Merger Agreement.

53.    The Acquisition FAQs also reinforced that Twitter employees would receive Plan benefits as detailed in the long-existing Twitter Severance Plan planning documents under the heading, "What is our general severance package if a position is eliminated?" The Acquisition FAQ update from October 24, 2022, stated: "Generally speaking, in the event of a position elimination our current severance package includes . . . at least. . . two months base salary or On Target Earnings for employees on the Sales Incentive Plan; Pro-Rated Performance Bonus Plan

compensation at target; Cash value of equity that would have vested within three months from the separation date; A cash contribution for health care continuation."

54. The Acquisition FAQs summarized certain components of, and provided further evidence of the existence of, the Twitter Severance Plan.

55. On information and belief, Defendant Musk approved a similar description of the Plan and some of its constituent parts that was sent to employees in a company-wide email in May 2022.

56. As communicated to employees in this email, the severance components included at least: two months base salary, prorated performance bonuses, payment for any RSUs vesting within three months of separation, and a cash contribution for continued healthcare coverage. These components are the same as some of the components of the severance package that would result from application of Plan documents such as the Matrix.

57. On information and belief, given the widespread skepticism of Defendant Musk's ability to operate Twitter successfully and the tightening of the tech labor market overall at the time, the parties to the Merger Agreement—Defendant Musk and the incoming leadership, as well as Twitter's outgoing management—knew that promising continued Twitter Severance Plan benefits was necessary to prevent mass resignations that would threaten the viability of the merger deal and, potentially, of the company itself.

**C.    Starting in October 2022, Defendants Failed to Fund the Plan and Pay Plan Benefits to Plan Participants**

58. Defendant Musk assumed control of Twitter and the Plan in October 2022.

59. Upon taking over Twitter on October 27, 2022, Defendant Musk dismissed Twitter's executive leadership and Board of Directors, and Defendant Musk became the sole director and CEO of the company.

60. With the assistance and input of the Doe Defendants, Defendant Musk immediately began widespread layoffs, which came in four large rounds: one in November 2022, two in December 2022, and one in February 2023, along with additional mass firings.

61.    On information and belief, in the weeks prior to the November 4, 2022 layoffs, Defendant Musk and the Doe Defendants met with Twitter human resources officials to discuss the layoffs.

62.    On information and belief, at these meetings, the Twitter human resources officials repeatedly told Defendant Musk and the Doe Defendants that (a) laid-off employees would be eligible for severance, and that (b) Twitter was obligated to pay severance according to the Merger Agreement and the representations the company made in the Acquisition FAQs, all of which Defendant Musk had approved.

63.    At these meetings, Twitter (now X Corp.), Defendant Musk, and/or the Doe Defendants exercised complete control over the Plan and the forthcoming severance to be offered to terminated employees.

64.    At no point did Twitter, Defendant Musk, the Doe Defendants, or anyone with control or discretion over the Plan inform employees of any anticipated changes to the Twitter Severance Plan.

65.    In fact, management communication with Plan participants regarding severance had largely gone silent since Defendant Musk's takeover, and Twitter did not respond to inquiries from Plan participants.

66.    Plan participants were left in the dark regarding the severance benefits they had been repeatedly promised.

67.    Public reporting suggests that, whereas prior to the merger Twitter would address employee questions about company policies (such as severance benefits) raised via the communication platform Slack, after the merger and around the time of impending layoffs, Defendants occasionally shut down Twitter's Slack entirely, to prevent potentially affected employees from seeking information and communicating among themselves about their benefits.

68.    Twitter also quietly shut down the email address employees could previously use for human resources inquiries.

69.    It has been reported that Twitter told some Plan participants to view Defendant

Musk's personal Twitter account or listen to episodes of the "All In" podcast, hosted by Defendant Musk's friends Jason Calacanis and David Sacks, for information about the layoffs and changes to company policies such as the Twitter Severance Plan.

70.     On November 4, 2022, Twitter fired approximately 3,700 employees, including Plaintiffs Ye and Kurtz.

71.     On December 16 and 22, 2022, Twitter further laid off employees in its public policy and infrastructure teams.

72.     On February 25, 2023, Twitter laid off an additional approximately 200 employees, or 10% of its remaining workforce.

73.     On September 27, 2023, it was publicly reported that Twitter laid off around half of the Election Integrity Team.

74.     On information and belief, Twitter has terminated at least 4,000 employees since Defendant Musk's takeover, significantly reducing the company's workforce.

75.     Defendants failed to pay any of these employees the severance benefits they were entitled to under the Plan. Despite the fact that all of the employees terminated in the wake of Defendant Musk's takeover were eligible for benefits under the Plan, Defendant Musk wrote on his Twitter account on November 4, 2022 that terminated employees were receiving "50% more than legally required."

76.     In fact, Twitter offered the terminated employees one month of severance compensation. Defendant Musk appears to have been referring to the two-month notice period required under the Worker Adjustment and Retraining Notification Act.

77.     The severance Twitter has offered to date is a fraction of what employees are entitled to as Plan participants. On information and belief, the terminated employees remain entitled to no less than $500 million.

78.     On information and belief, the base severance component under the Twitter Severance Plan is six months' base pay plus one week for each full year of service for senior employees, and less senior employees are entitled to two months' base pay plus one week for each

full year of service.

79.     In addition, employees are entitled to their RSUs, bonuses, a cash contribution for health insurance, and three to six months of outplacement services.

80.     As a Level-4/Level-5 employee with just under a year of tenure at Twitter, Plaintiff Ye was entitled to two months' pay, a lump sum payment equal to the cost of three months of continuing health insurance coverage, three months of outplacement services, and the value of any RSUs that vested within three months of her termination, in addition to any bonuses, prorated to the time of termination.

81.     Twitter offered Plaintiff Ye severance equal to one month of pay in exchange for signing a general release of claims. This amount of severance was substantially less than she was entitled to under the Twitter Severance Plan.

82.     As a Level-5/Level-6 employee with over two years' tenure at Twitter, Plaintiff Kurtz was entitled to two-and-a-half months pay, a lump sum payment equal to the cost of three months of continuing health insurance coverage, three months of outplacement services, and the value of any RSUs that vested within six months of her termination, in addition to any bonuses, prorated to the time of termination.

83.     Twitter offered Plaintiff Kurtz severance equal to one month of pay in exchange for signing a general release of claims. This amount of severance was substantially less than he was entitled to under the Twitter Severance Plan.

84.     On information and belief, Twitter did not provide the full benefits owed under the Plan to any Plan participants pursuant to orders from Defendant Musk.

85.     On information and belief, Defendants withheld information and misled employees about severance benefits, failed to ensure the Plan had access to sufficient funds to pay severance benefits, and decided to deny severance benefits because of the cost to Twitter (and ultimately Musk as the owner of Twitter). Defendants knowingly and intentionally failed to inform Plaintiffs and other terminated employees about the existence of the Twitter Severance Plan, that they had rights under ERISA as beneficiaries of the Plan, and that they were entitled to substantially greater

benefits than Twitter was offering them. Indeed, Defendant Musk falsely claimed that terminated employees were receiving "50% more than legally required."

### CLASS ACTION ALLEGATIONS

86.     Section 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).  Section 1132(a)(3) authorizes any participant or beneficiary to enjoin any act or practice that violates any provision of ERISA or the terms of the plan or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan.

87.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Twitter Severance Plan on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Specifically, Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Plan who were terminated from Twitter since the date of Defendant Musk's takeover, October 27, 2022, through the date of judgment.

88.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The Class includes thousands of members and is so large that joinder of all its members is impracticable.

b.     There are numerous questions of law and fact common to this Class because the Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any

individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include, without limitation, the following: (i) whether Twitter's Severance Plan is an employee welfare benefit plan as that term is defined in 29 U.S.C. § 1002; (ii) whether each of the Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); (iii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by misleading Class members about their eligibility for severance and by denying Plan benefits to Plan participants; (iv) whether Plaintiffs' claims require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class; and (v) what Plan-wide equitable and other relief the Court should impose in light of the Defendants' breach of duties.

c.      Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the Class Period and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they participated in the Plan during the Class Period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      There are no substantial individualized questions of law or fact among Class members on the merits of this Action.

89.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants in respect to the discharge of their fiduciary duties to participants and beneficiaries and to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries'

ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

90.    Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate in respect to the Class as a whole.

91.    Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by some individual participants and beneficiaries may be small and it may be impracticable for all individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

92.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Defendants' liability to the Class for their disloyal conduct.

93.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

**COUNT I**
**Breach of Fiduciary Duties by Failing to Fund the Plan**
**29 U.S.C. §§ 1104(a)(1) and 1132(a)(2)**

94.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

95.    The Twitter Severance Plan is a "welfare benefit plan" under ERISA and pursuant to the provisions of 29 U.S.C. § 1002(1) and 29 U.S.C. § 186(c)(6).

96.    Twitter administered the Plan and served as a fiduciary. Beginning on October 27,

Case No. 3:25-cv-9501

COMPLAINT

17

1    2022, Defendant Musk and the Doe Defendants began exercising discretion and control over the

2    Plan and became functional fiduciaries.

3        97.    As the Plan sponsor and administrator, X Corp. (formerly Twitter) is liable under

4    Count I.

5        98.    Defendant Musk is also personally liable due to the unity of interest and ownership

6    that existed, and continues to exist, between Defendant Musk and Twitter.

7        99.    Defendant Musk has substantially commingled his own assets and other businesses

8    with Twitter and repeatedly failed to observe the strictures of the corporate form.

9        100.    It has been widely reported that Defendant Musk has conscripted employees from

10    his other companies, as well as friends and family, to do work at and for Twitter. This would enable

11    Twitter to continue functioning despite mass layoffs without any risk of having to pay the

12    severance benefits to the conscripted employees.

13        101.    According to public reports, Defendant Musk financed his purchase of Twitter in

14    part through a billion-dollar loan from one of his other companies, SpaceX.

15        102.    According to public reports, Defendant Musk also financed his purchase of Twitter,

16    and paid back his loan from SpaceX, by selling his stocks in another one of his companies, Tesla.

17        103.    Moreover, to the extent X Corp. finds itself in a state of financial precariousness

18    and unable to meet its obligations to the Plan, it is the direct result of the debt Defendant Musk

19    loaded on to the company through the inflated price that Defendant Musk offered for the company.

20        104.    By setting the purchase price and agreeing to the terms of the Merger Agreement,

21    Defendant Musk also set the price for the RSU shares that were promised to terminated employees,

22    but which he and the other Defendants now refuse to pay.

23        105.    For the Plan and Plan participants to be deprived of the full value of their promised

24    severance, at prices Defendant Musk himself set, because of potential corporate insolvency that

25    Defendant Musk himself caused, would be inequitable.

26        106.    Starting in October 2022, Defendant Musk was sole owner and CEO of Twitter,

27    and acted with unchecked discretion and control over nearly every aspect of the company.

28

107.    According to publicly filed documents and his own representations, Defendant Musk purchased Twitter and took the company private primarily for personal and political reasons, including the views on free speech held by Defendant Musk and others close to him. Defendant Musk also failed to effectuate the Plan in the best interests of the Plan and Plan participants.

108.    Defendant Musk and Twitter publicly presented themselves as each other's alter egos: Defendant Musk routinely used his personal Twitter account to propose and announce changes in company policy, including hiring and firing decisions, and official Twitter communications described the company as "Twitter 2.0: an Elon company."

109.    On information and belief, the decision to deny employees' severance was made by Defendant Musk after Defendant Musk and the Doe Defendants reviewed the numbers on how much paying the severance would cost the company. It would be inequitable and unjust to prevent the Plan and Plan participants from recovering benefits and remedies from the person most responsible: Defendant Musk.

110.    The fiduciary duties imposed by 29 U.S.C. § 1104(a)(1)(A)(i) require a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries."

111.    The Merger Agreement required Twitter and Defendants to pay benefits under the Severance Plan for one year from the date of Defendant Musk's purchase of Twitter.

112.    The Merger Agreement created an obligation that the Severance Plan be sufficiently funded to pay benefits to all participants who qualified for benefits under the terms of the Plan.

113.    Instead of fulfilling their obligations under the Plan and their fiduciary obligations to the Plan, Defendants secretly disemboweled the Plan and its components, leaving the Plan unable to make promised payments to participants.

114.    All Defendants are liable under Count I. Defendant Musk and the Doe Defendants are personally liable as fiduciaries of the Plan who failed to fund the Plan as required, instead likely diverting Plan funds to other company expenses to the detriment of participants and beneficiaries.

Defendant Musk and Doe Defendants also made the decision to deny participants the outplacement services provided by the Plan, resulting in unnecessary expenses to the Plan. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter, a fiduciary and sponsor of the Plan. Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

<u>**COUNT II**</u>
**Breach of Fiduciary Duties by Failing to Provide Complete and Accurate Information**
**29 U.S.C. §§ 1104(a)(1) and 1132(a)(3)**

115.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

116.    The fiduciary duties imposed by 29 U.S.C. § 1104(a)(1) include a duty to communicate truthfully and accurately with plan participants and beneficiaries about the plan. This includes a duty not to mislead plan participants and beneficiaries about the plan and its benefits. It also includes a duty to inform plan participants when changes to a plan are under "serious consideration." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180–82 (9th Cir. 2004). Relatedly, a fiduciary has an affirmative duty to disclose any information about a plan that would be harmful to withhold, in light of the fiduciary's knowledge about a participant's situation. *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995).

117.    As alleged above, the Defendants communicated extensively with Twitter employees about upcoming layoffs, their eligibility for severance, and the amount and form that severance would take.

118.    With each communication, Defendants misled Plan participants about their eligibility.

119.    Defendants approved the Acquisition FAQs sent to employees informing them of certain components of the Plan.

120.    In meetings prior to the November 4 layoffs, on information and belief, Defendant Musk and the other individual Defendants were planning to proceed with mass layoffs without abiding by the Plan.

121.    Yet Defendants made no efforts to disclose to Twitter employees that any changes

to the Twitter Severance Plan were under serious consideration.

122.    On information and belief, employees asked the Defendants specifically about the Plan and their eligibility for severance at various times leading up to and following the layoffs.

123.    However, Defendants engaged in a campaign of obfuscation to hide the existence of the Plan; to mislead participants about the Plan's content and employees' eligibility for benefits under the Plan; and to mislead participants about the amount of benefits they were owed and would be offered.

124.    On information and belief, rather than candidly respond to employee inquiries about the Plan or other work policies, Defendants instructed employees to view Defendant Musk's personal Twitter account and listen to episodes of the "All In" podcast.

125.    By directing employees to podcasts and Twitter accounts instead of providing information about the Plan, Defendants failed in their fiduciary duties to disclose information.

126.    On information and belief, at no point following Defendant Musk's acquisition of Twitter did Defendants affirm the existence of the Plan, its components, or employees' eligibility for benefits under it. Nor did any Defendants notify Plan participants that any changes were under serious consideration, even though Defendants knew that participants were expecting benefits under the Plan, as Defendants had previously promised them.

127.    When Twitter terminated employees, Defendants offered severance benefits to Plan participants that were substantially and materially lower in value than the benefits to which the employees were entitled as Plan participants. Defendants unlawfully and in breach of their fiduciary duties offered those reduced benefits to Plan participants only in exchange for a general release of claims against Twitter. Defendants knowingly and intentionally failed to inform Plaintiffs and other terminated employees about the existence of the Twitter Severance Plan, that they had rights under ERISA as beneficiaries of the Plan, and that they were entitled to substantially greater benefits than Twitter was offering them under the Plan.

128.    The statements and communications regarding severance benefits were part of Defendant Musk's disloyal and dishonest strategy: to retain employees by promises of the Plan's

severance and then deny the Plan's existence when the employees were fired.

129.    These misrepresentations caused material harm to Plan participants. Employees received less severance than they were owed and were denied Plan benefits. Employees continued working at Twitter throughout the layoffs, understanding they would be eligible for severance benefits in the event of layoffs.

130.    Furthermore, Plaintiffs were irreparably harmed by being deprived of the Plan outplacement services designed to help employees recover professionally in the immediate aftermath of their termination.

131.    All Defendants are liable under Count II. Defendant Musk and the Doe Defendants are personally liable as fiduciaries of the Plan who misled, hid, or failed to disclose information about the Plan, including changes that were under serious consideration. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter/X Corp., a fiduciary and sponsor of the Plan. Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

## COUNT III
### Liability Pursuant to 29 U.S.C. §§ 1105(a) and 1132(a)(3)

132.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

133.    As alleged above, all Defendants were fiduciaries who failed to monitor other Plan fiduciaries or non-fiduciaries who knowingly participated in the fiduciaries' breach of duties.

134.    Section 1105(a) of Chapter 29 of the U.S. Code imposes liability on a fiduciary for another fiduciary's breach of a duty with respect to a plan if he or she (i) knows of such a breach and fails to remedy it, (ii) knowingly participates in a breach, or (iii) enables a breach.

135.    Section 1132(a)(3) imposes the same liability on non-fiduciaries.

136.    Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

137.    Defendants knowingly participated and enabled Twitter's breach of its obligations under the Plan.

Case No. 3:25-cv-9501

138.     Defendants knowingly participated and enabled the campaign of deceit surrounding the Plan and its benefits.

139.     To this day, Defendants have not done anything to remedy these breaches.

140.     All Defendants are jointly and severally liable under Count III as co-fiduciaries, or as knowing participants in other Defendants' violations of fiduciary duties. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter, a fiduciary and sponsor of the Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants as follows:

141.     An order Compelling Defendants to abide by the requirements of ERISA with respect to the Severance Plan;

142.     An Order compelling Defendants to abide by the terms of the Twitter Severance Plan as described in the Matrix, and as summarized in the Acquisition FAQ, and other relevant documents;

143.     An Order compelling Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan;

144.     An Order enjoining Defendants from any further violations of ERISA, including their fiduciary duties prescribed therein;

145.     An Order requiring Defendants to fund the Plan in an amount sufficient to pay to Plan participants;

146.     Disgorgement of any excessive fees or amounts by which Defendants unjustly enriched themselves through the violations of their fiduciary duties;

147.     Find and adjudge that Defendants Musk and Does are personally liable for losses to the Plan;

148.     Attorneys' fees and costs pursuant to ERISA § 502(g);

149.     Service awards for the named Plaintiffs in recognition of the time, effort, and risk they incurred in bringing this action and as compensation for the value they have provided to the

1  class members; and

2        150.    An Order compelling Defendants to provide the full terms of severance according

3  to the Plan to all terminated employees from the date of Defendant Musk's takeover of the

4  company to one year from the date of execution of the Merger Agreement, an amount that is no

5  less than $500 million, plus pre-judgment and post-judgment interest at the maximum legal rate.

6  Counsel for Plaintiffs demand a trial by jury.

7

8  DATED: November 4, 2025                          Respectfully submitted,

9                                                   Sanford Heisler Sharp McKnight, LLP

10                                                  By: _____
                                                    Kate Mueting (D.C. Bar No. 988177)
11                                                  Shannon Henris (D.C. Bar No. 90017882)
                                                    (*pro hac vice* applications forthcoming)
12                                                  kmueting@sanfordheisler.com
                                                    **SANFORD HEISLER SHARP**
13                                                  **MCKNIGHT, LLP**
                                                    700 Pennsylvania Ave SE, Suite 300
14                                                  Washington, DC 20003
                                                    Telephone: (202) 499-5206
15

16                                                  Charles Field (CA Bar No. 189817)
                                                    cfield@sanfordheisler.com
17                                                  **SANFORD HEISLER SHARP**
                                                    **MCKNIGHT, LLP**
18                                                  7911 Herschel Avenue
                                                    La Jolla, CA 92037
19                                                  Telephone: (619) 577-4252
20

21                                                  Kristi Stahnke McGregor (GA Bar No.
                                                    674012)
22                                                  (*pro hac vice* application forthcoming)
                                                    kmcgregor@sanfordheisler.com
23                                                  **SANFORD HEISLER SHARP**
                                                    **MCKNIGHT, LLP**
24                                                  611 Commerce Street, Suite 3100
                                                    Nashville, TN 37203
25                                                  Telephone: (615) 434-7008
26

27                                                  Susannah R. Cohen (NY Bar No. 6048102)
                                                    (*pro hac vice* application forthcoming)
28                                                  **SANFORD HEISLER SHARP**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MCKNIGHT, LLP**
17 State Street, 37th Floor
New York, NY 10004
Telephone: (646) 402-5646
scohen@sanfordheisler.com

*Attorneys for Plaintiffs Diana Ye and Brian
Kurtz, on behalf of themselves and all others
similarly situated*

Case No. 3:25-cv-9501

1

**CERTIFICATION OF CONFLICTS AND INTERESTED ENTITIES OR PERSONS**

2

        Pursuant to Civil L.R. 3-15, the undersigned certifies that as of this date, there is no

3

conflict of interest (other than the named parties) to report.

4

        I certify under penalty of perjury under the laws of the United States of America that the

5

foregoing is true and correct.

6

7

8

Dated: November 4, 2025

Kate Mueting (D.C. Bar No. 988177)

9

(*pro hac vice* application forthcoming)

kmueting@sanfordheisler.com

10

**SANFORD HEISLER SHARP**

**MCKNIGHT, LLP**

11

700 Pennsylvania Ave SE, Suite 300

Washington, DC 20003

12

Telephone: (202) 499-5206

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:25-cv-9501

COMPLAINT

26