Kate Mueting (D.C. Bar No. 988177))*
Shannon Henris (D.C. Bar No. 90017882))*
(*pro hac vice* applications forthcoming)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
700 Pennsylvania Avenue SE, Suite 300
Washington, DC 20003
Telephone: (202) 499-5206
kmueting@sanfordheisler.com
shenris@sanfordheisler.com

Charles Field (CA Bar No. 189817)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
7911 Herschel Avenue, Suite 300
La Jolla, CA 92037
Telephone: (619) 577-4252
cfield@sanfordheisler.com

Kristi Stahnke McGregor (GA Bar No. 674012))*
Dacey Romberg (TN Bar No. 036767) (*pro hac vice* application forthcoming)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
611 Commerce Street, Suite 3100
Nashville, TN 37203
Telephone: (615) 434-7008
kmcgregor@sanfordheisler.com
dromberg@sanfordheisler.com

Susannah R. Cohen (NY Bar No. 6048102))*
(*pro hac vice* application forthcoming)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
17 State Street, 37th Floor
New York, NY 10004
Telephone: (646) 402-5646
scohen@sanfordheisler.com

*Attorneys for Plaintiffs Diana Ye and, James Brian Kurtz, and Tushar Bhushan,
on behalf of themselves and all others similarly situated*

*Admitted pro hac vice*

Case No. 3:25-cv-9501-PHK

AMENDED COMPLAINT

1

1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTHERN CALIFORNIA**

2

3

DIANA YE and, JAMES BRIAN KURTZ, and TUSHAR BHUSHAN on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

X CORP., f/k/a/ TWITTER, INC., X HOLDINGS CORP., X.AI HOLDINGS CORP., ELON MUSK, Doesand DOES,

Defendants.

~~Case No. 3:25-cv-9501~~

Case No. 3:25-cv-9501-PHK

AMENDED CLASS ACTION COMPLAINT

DEMAND FOR JURY TRIAL

~~DEMAND FOR JURY TRIAL~~

**INTRODUCTION**

1.    This ERISA class action is brought on behalf of former employees of Defendant X Corp., the company that acquired Twitter, Inc., in October 2022. Plaintiffs allege that Twitter/X, Defendant Musk, and other Defendants failed to pay thousands of laid off employees the severance benefits owed to them under Twitter's long-standing ERISA severance plan (the "Twitter Severance Plan" or the "Plan"). Defendant Musk and other Defendants enriched themselves, in breach of their fiduciary duties, by misleading Plan participants and failing to give them complete and accurate information about their ERISA rights and available severance benefits.

1.2.    Plaintiffs Diana Ye and, James Brian Kurtz,[1] and Tushar Bhushan, individually, on behalf of the Twitter Severance Plan (the "Severance Plan" or "Plan"), and on behalf of a class of similarly situated Plan participants and beneficiaries, bring this action for the recovery of owed

---

[1] This Amended Complaint has been updated to reflect Mr. Kurtz's full legal name.

1    severance benefits and relief from fiduciary violations pursuant to the Employee Retirement

2    Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

3          3.      Twitter Inc. ("Twitter")[2] maintained a policy and practice of paying regular

4    severance benefits for many years. ~~On information and belief, since~~ under the Twitter Severance

5    Plan. Since at least 2019 and running through at least October 2022, Twitter formalized this policy

6    in ~~several documents~~at least one document that ~~provide~~provided a ~~uniform and~~ detailed ~~policy~~

7    framework for determining the ~~numerous post-termination~~severance benefits Twitter

8    ~~provided~~available to employees. ~~The administration of this plan was ongoing for many years and~~

9    ~~was effectuated by teams of employees from several departments within Twitter, as well as by~~

10   ~~contracts with third parties. By operating a severance plan requiring ongoing maintenance and~~

11   ~~administration~~

12

13         ~~2.~~4.    In April 2022, Twitter ~~was operating an employee welfare benefit plan, as defined~~

14   ~~in 29 U.S.C. § 1002(1)(A).~~announced that the company had entered into a merger agreement with

15   Defendant Elon Musk, and Defendant Musk took over the company by October 2022.

16

17         5.      ~~The Plan fiduciaries, as that term is defined in 29 U.S.C. § 1002(21)(A), include~~

18   ~~Twitter (and its successor company, X Corp., its parent, X Holdings Corp., and, on information~~

19   ~~and belief, the parent company of X Holdings Corp., X.AI Holdings Corp.); Elon Musk who, as~~

20   ~~sole owner and CEO of Twitter during the events of this case, exercised complete control and~~

21   ~~discretion over the Plan, managed the Plan, and directed communications to employees about it.~~

22   Between April and October 2022, there were very public fights over the merger, throwing the

23

24

25   [2] ~~Simultaneous to~~During the events described in this complaint, Defendant X Corp~~., a wholly owned~~
     ~~subsidiary of Defendant X Holdings Corp.,~~ became successor in interest to the company formerly known
26   as Twitter Inc. and assumed all of Twitter Inc.'s debts and obligations. The company and social
     media service formerly known as Twitter then changed its name to "X." For clarity and
27   consistency, this complaint uses the name Twitter to describe the social media company and
     platform for which Plaintiffs and members of the potential class worked.
28
                                                                    Case No. 3:25-cv-9501-PHK

future of the company into chaos and raising alarm among Twitter employees.

6.    Facing the potential of a mass exodus of employees, Twitter repeatedly assured employees that Twitter's existing severance benefits would remain available to employees in the event of layoffs.

7.    However, after the merger, Defendants laid off thousands of employees and failed to pay them benefits they were entitled to under the Twitter Severance Plan.

8.    For the purpose of benefitting themselves at the expense of Plaintiffs and other class members, and in breach of their fiduciary duties, Defendants failed to provide Plaintiffs with sufficient information about the Twitter Severance Plan or their ERISA rights and instead informed Plaintiffs and class members that the only way they would receive even a small severance payment was to execute a broad release purporting to waive all claims against Defendants, including claims for benefits under the Twitter Severance Plan.

9.    Thousands of former Twitter/X employees have not received the severance benefits that were supposed to remain available after the tumultuous merger.

10.    At the time Defendants failed to pay Twitter Severance Plan benefits and failed to provide adequate information about benefits to the Plan participants, Defendants knew about the long-established Plan, knew laid-off participants were eligible for benefits under the Plan, knew that Plan participants were eligible for severance benefits, and knew that many Plan participants relied on the continued existence of the severance plan in deciding to stay with Twitter during the chaotic merger.

11.    At all relevant times during the merger and layoffs, Defendants acted as plan fiduciaries by exercising discretionary authority over the operation and/or administration of the Twitter Severance Plan.

12.    Defendants wrongly denied Plan participants benefits under the Twitter Severance

1  Plan.

2      3.    Defendants breached their fiduciary duties to act in the best interest of Plan

3  participants and to provide Plan participants with accurate and complete information. The Doe

4  Defendants were also Plan fiduciaries as they communicated with Plan participants about the Plan

5  and, on information and belief, exercised control and discretion over it.

6      4.13.   As Defendant Musk assumed control of Twitter, he and other fiduciaries engaged

7  in a campaign of deception towards employees regarding the existence of the Twitter Severance

8  Plan and employees' eligibility for severance benefits. Without providing any notice to

9  participants, and at times affirmatively misleading them, Defendant Musk and the other

10  Defendants caused the Plan to be deprived of its funds and benefit components. When Defendant

11  Musk and the other Defendants then began a course of mass terminations, Plan participants were

12  wrongfully denied the benefits to which the Plan entitled them, some of which Defendants had

13  promised and were obligated to provide. The result of Defendants' conduct was the wrongful

14  denial of benefits to participants and a Plan that had been disregarded, with benefits accruing to

15  the company and Defendant Musk rather than participants.

16

17  **THE PARTIES**

18      5.14.   Plaintiff Diana Ye was a Plan participant and a Twitter employee from November

19  30, 2021 through her separation date of January 4, 2023. Plaintiff Ye was a Level-4/Level-5 Data

20  Analyst. She worked in San Francisco, California and currently resides in Cumming, Georgia.

21

22  Plaintiff Ye was informed of her termination on November 4, 2022.

23      6.15.   Plaintiff James Brian Kurtz was a Plan participant and a Twitter employee from

24  March 30, 2020 through his separation date of January 4, 2023. Plaintiff Kurtz was a Level-

25  5/Level-6 Senior Engineering Technical Program Manager. He worked in San Francisco,

26  California and currently resides in Oakland, California. Plaintiff Kurtz was informed of his

27  termination on November 4, 2022.

28

Case No. 3:25-cv-9501-PHK

AMENDED COMPLAINT

5

16.    Plaintiff Tushar Bhushan was a Plan participant and a Twitter employee from June 20, 2016 through his separation date of January 4, 2023. Plaintiff Bhushan was a Level-6/Level-7 Senior Partner Engineer. He worked in San Francisco, California and currently resides in Oakland, California. Plaintiff Bhushan was informed of his termination on November 4, 2022.

17.    Defendant Elon Musk purchased Twitter, with an effective transfer date of October 28, 2022.

18.    Defendant Musk influenced and/or authorized communications related to severance benefits and making decisions related to the Twitter Severance Plan starting between April and October 2022 and continuing after the merger. Once he became sole owner and CEO, he exercised more control and discretion over the Twitter Severance Plan. ERISA defines a "fiduciary" as a person who is exercising "any discretionary authority or discretionary control respecting management of [a benefits] plan" or who has "discretionary authority or discretionary responsibility in the administration of [a benefits] plan." 29 U.S.C. § 1002(21)(A)(i), (iii). Defendant Musk was therefore a fiduciary of the Plan beginning as early as April 2022 and no later than October 27, 2022.

19.    Defendant X Corp. is a Nevada corporation and the successor to Twitter, Inc., a Delaware corporation, by merger. . X Corp. that succeeded to all of Twitter, Inc.'sTwitter's obligations upon the merger. On information and belief, X Corp. is headquartered at Twitter's former headquarters in San Francisco, California.

7.20.    X Corp. serves as sponsor, administrator, and fiduciary of the Plan. X Corp. is a wholly owned subsidiary of X Holdings Corp., also referred to as X Holdings.

8.21.    Defendant X Holdings Corp. (XHC) is a Nevada corporation and the parent company of X Corp. XHC is the successor to X Holdings I, Inc., which facilitated the merger of X Corp. with Twitter by serving as the parent corporation to the acquisition subsidiary. X Holdings

Corp.XHC succeeded to all of X Holdings I's obligations, including its obligations under the April 25, 2022 Merger Agreement between Defendant Musk and Twitter (the "Merger Agreement").

9.22.    Defendant X.AI Holdings Corp. (X.AI) is a Nevada corporation and, on information and belief, acquired X Holdings Corp.XHC. X.AI Holdings Corp. succeeded to all of X Holdings Corp.'sXHC's obligations, including its obligations under the Merger Agreement. This included the obligation to maintain and administer the Twitter Severance Plan. Accordingly, X.AI Holdings Corp. is a sponsor, administrator, and fiduciary of the Plan.

10.    OwnershipAt least one of the corporate Defendants (Twitter was transferred to Defendant Elon Musk on October 27, 2022.

11.23.    As sole owner, X Corp., XHC, and CEO, Defendant Musk exercised discretion and control over the Twitter Severance X.AI) has been a Plan and was thus a functional fiduciary of the Plan, as that term is defined in 29 U.S.C. § 1002(21)(A), since at least 2019.

12.    Because Plaintiffs are currently unaware of the full scope of identities of the other individuals who had fiduciary duties to Plan participants, those individuals (who may include formal employees of Twitter and/or informal advisors to Defendant Musk) are collectively named as Doe Defendants Does. Plaintiffs will substitute the real names of Does when they become available to Plaintiffs. The Doe Defendants were also Plan fiduciaries as they communicated with Plan participants about the Plan and, on information and belief, exercised control and discretion over it.

**JURISDICTION, VENUE, AND STANDING**

13.24.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(1)(B), (a)(2)), and 1132(a)(3).

14.25.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and

28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where at least one of the alleged breaches took place. It is also the District in which ~~Defendants Twitter and X Holdings~~X Corp. ~~reside~~ resided at the time of most of the allegations in this Amended Complaint.

26.    ~~As~~Plaintiffs bring this suit under 29 U.S.C. § 1132(a)(1)(B) as Plan participants~~,~~ who have been wrongly denied severance benefits.

27.    Plaintiffs bring this suit under 29 U.S.C. § 1132(a)(2) ~~and~~ in a representative capacity on behalf of the Plan.

~~15.~~28.  Plaintiffs bring this suit under 29 U.S.C § 1132(a)(3) in a representative capacity on behalf of ~~the Plan and~~ all Plan participants.

~~16.~~29.  Plaintiffs have standing to bring claims on behalf of all participants in the Plan because the alleged harms to Plan participants can be traced to the same challenged conduct: Defendants' deceitful statements and omissions to Plan participants, refusal to pay benefits due under the Plan to terminated employees, and Defendants' purposeful mismanagement of the Plan~~, and Defendants' deceitful treatment of the Plan participants~~.

### **~~FIDUCIARY STANDARDS~~**

~~17.    ERISA provides that in the absence of a designated plan "Administrator," the employer is an administrator and fiduciary. *See* 29 U.S.C. § 1002(16)(A); ERISA § 3(16)(A).~~

~~18.    Twitter, as the employer sponsor of the Severance Plan, was an administrator and fiduciary of the Plan.~~

~~19.    ERISA also provides that individuals who perform fiduciary functions are fiduciaries. People are fiduciaries to the extent they "exercise any discretionary authority or discretionary control respecting management of such plan" or have "any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).~~

~~20.    Each of the Defendants were fiduciaries with respect to the Plan and its participants~~

1   because they exercised discretionary authority or control over the management of the Plan and/or

2   were involved in its administration.

3         21.    Defendant Musk and the other Defendants made decisions about the size and

4   availability of Plan disbursements, and which and how many employees would be eligible for

5   them.

6         22.    Defendant Musk and the other Defendants communicated with employees about

7   the availability of severance.

8         23.    By virtue of these actions, as well as their roles within Twitter, Defendant Musk

9   and the Doe Defendants exercised discretionary authority or control respecting the management,

10  control, and administration of the Plan and its assets.

11        24.    As set forth above, the Defendants acted in a fiduciary capacity with respect to the

12  Plan: by administering the Plan, making decisions regarding employees' eligibility for benefits

13  under the Plan, and communicating with employees about the Plan.

14        25.    As set forth here, the Defendants violated their fiduciary duties in several ways.

15        26.    These violations of fiduciary duties caused substantial harm to the Plan and its

16  participants, by causing the Plan to be deprived of the funds necessary to make full payments to

17  Plan participants and by denying participants non-monetary transition services.

18        27.    Defendants are personally and jointly and severally liable for the harm to the Plan

19  and to Plan participants that resulted from Defendants' breaches of their fiduciary duties.

20                          **FACTUAL BACKGROUND**

21  **A.    Twitter Maintained an ERISA Plan**

22        28.30.  On information and belief, sinceBetween at least 2019 and 2022, Twitter

23  maintained a severance plan for the purpose of providing employee participants with certain

24  benefits in the event of unemployment, also known as an employee welfare benefit plan. *See* 29

25  U.S.C § 1002(1). Accordingly, Twitter engaged inhad an ongoing policy and practice of providing

26  severance benefits to eligible departing employees since at least 2019.("Twitter Severance Plan"

27  or "Plan").

28

31.    ~~Plaintiffs Kurtz and Ye learned~~The administration of ~~allegations related to~~ the Twitter Severance Plan continued for years and involved teams of employees from several departments within Twitter and third-party contractors.

~~29.~~32.  Plaintiffs allege the facts in this Amended Complaint based upon ~~reading~~personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things: (i) a review of Defendants' filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) transcripts, press releases, news articles, analyst reports, and other public statements issued by or concerning Defendants; (iii) information from former Twitter employees, industry professionals, and other knowledgeable persons; and (iv) other publicly available information, including the amended complaint in *McMillian, et al. v. Musk, et al.*, No. 3:23-cv-03461, Dkt. 13 (N.D. Cal. ~~2023).³  Many of~~ 2023).[4] Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations ~~in this complaint relating to the Twitter Severance Plan are based on those publicly reported allegations.~~ set forth in this Complaint after a reasonable opportunity for further investigation or discovery.

~~30.    On information and belief, this plan was detailed in company-created Plan documents, which represented the formalization of a longstanding company policy~~One of ~~providing post-termination benefits to departing employees.~~

---

~~³ On October 16, 2025, Plaintiffs Courtney McMillian and Ronald Cooper moved to dismiss their appeal in the Ninth Circuit. *See McMillian, et al. v. Musk, et al.*, No. 24-5045, Dkt. 57 (9th Cir. Oct. 16, 2025). Plaintiffs intend to file an Administrative Motion to Consider Whether Cases Should be Related pursuant to Local Rule 3-12.~~

[4] On October 16, 2025, Plaintiffs Courtney McMillian and Ronald Cooper moved to dismiss their appeal in the Ninth Circuit, which was granted on December 10, 2025. *See McMillian, et al. v. Musk, et al.*, No. 24-5045, Dkt. 57 (9th Cir. Oct. 16, 2025); Dkt. 100 (9th Cir. Dec. 10, 2025). Plaintiffs intend to file an Administrative Motion to Consider Whether Cases Should be Related pursuant to Local Rule 3-12.

31.33.  On information and belief, one of these the Twitter Severance Plan documents was is a Plan Matrix, (the "Matrix"), which Twitter used (and may continue to use) to determine an employee's eligibility for severance, benefits and the amount and type of severance benefits an eligible employee would receive under the Twitter Severance Plan.

34.    Whether an A Plan administrator would apply the Twitter Severance Plan by first assessing the reason for an individual employee's departure to determine whether the employee was eligible for severance benefits under the Plan and the amount and type of severance benefits an eligible employee would receive under the Plan.

35.    The determination of why an individual employee was eligible for severance and the amount and type of departed is not always clear and may require conferring with an employee's management to consider the details surrounding an employee's departure.

36.    The Twitter Severance Plan provides several components to a severance an eligible employe would receive was dependent on several benefits package—a payment for a certain amount of base pay, a portion of bonuses, the value of a certain amount of equity known as Restricted Stock Units (RSUs), payment for health care premiums for a certain number of months, and a period of outplacement services.

37.    The value of each component of the Twitter Severance Plan—base pay, bonuses, RSUs, health care, and outplacement services—depended on factors, including such as the reason for the departure, an employee's tenure at the company, job type (sales or non-sales), job level, department, restricted stock unit (RSU) issuance and price of RSUs at the time of departure, whether the geographical location, and participation in certain programs.

32.38.  In addition to assessing the reason for an employee's departure entailed any legal risk, the Plan allowed administrators to exercise discretion by adjusting packages due to litigation risk for the company, and potentially other factors.

33.    The types of benefits included payments based on employee salary, tenure, job level, department, and, importantly, reason for and circumstances of departure; a payment for health insurance continuation; pro-rated bonuses for certain types of employees; payments for RSUs; and outplacement services.

34.    As described in allegations in a prior lawsuit, the Plan consisted of several distinct separation scenarios, each of which implicated a separate set of criteria of parameters based on the employee's role in the company and eligibility for different severance components. In turn, each of these severanceAdministering the Plan components contained separate criteria based on an employee's tenure and levels, as well as the specific information about each employee's participation in company health, bonus, and equity programs.

35.39.  The Plan also included multiple discretionary components and provided that each package be individually assessed and adjusted based on a determination of litigation risk, reason for departure, and "other factors." Outplacement services to departing employees requires an ongoing administrative scheme. The payments were provided on an ongoing basis throughby the company, and the outplacement services component was provided to each employee on an ongoing basis and required coordination with a third-party service provider and the duration of this service depended on an employee's level at the time of separation, as did Twitter's contribution for continued healthcare coverage..

36.    A further component of the Plan came in the form of a payout for Restricted Stock Units (RSUs) issued to employees as part of their compensation. Terminated employees were entitled to the value of any RSUs that vested according to their regular schedule for a period of three to six months following termination, depending on employee level. The value of each RSU was set according to an average price at the time of separation.

37.40.  As described in allegations in a prior lawsuit, Twitter tasked several Human Resource employees with applying the Matrix to departing employees, including former Head of People Experience, Courtney McMillian. These employees created and used templates and

spreadsheets to process claims for benefits under the Plan.

38.41.  ~~Twitter~~From time to time, employees from ~~some~~ other departments were involved in applying the Matrix to departing employees~~.~~: assessing their eligibility, applying the factors contained in the Matrix, and ensuring that the payments and services set forth in the Matrix were provided to departing employees.

39.42.  Internal procedures existed for amending the Twitter Severance Plan ~~and Plan documents~~, including that changes to the ~~Matrix. These amendments required~~Plan had to be approved by senior leadership ~~approval and occurred numerous times since 2019~~and could occur only after the company satisfied other legal obligations.

40.43.  Twitter's administration of the Plan required regular, ongoing expenses of company funds and an ongoing administrative scheme.

~~41.1.    The Plan was in effect for the entire duration of Plaintiffs' employment with Twitter and was in effect as of October 2022, when Defendant Musk acquired the company.~~

~~42.1.    In the days, weeks, and months before Defendant Musk's takeover, Twitter assured employees that severance benefits would continue and that employees who stayed on through the takeover would receive them in the event of layoffs. To this end, Twitter published company-wide "Acquisition FAQs" summarizing some components of the Twitter Severance Plan in April, June, and October 2022. Twitter also sent a company-wide email in May 2022 summarizing the Plan.~~

~~43.    Twitter executives made similar promises in company-wide, all-hands meetings throughout this time.~~

44.    While the existence of the Twitter Severance Plan was documented in company policies, including a Plan Matrix, and demonstrated by Twitter's practice of paying benefits according to the Plan, Twitter failed to disseminate complete and accurate details of the Plan to participants or file a Form 5500 with the Department of Labor.

**B.    Twitter and Defendant Musk Informed Plan Participants that the Severance Benefits Would ~~Remain~~Continue Post-Merger**

44.45.  On April 25, 2022, Defendant Musk and Twitter announced they had entered into a Merger Agreement, under which Defendant Musk agreed to purchase Twitter. ~~The merger was set to close in October 2022.~~

46.    The Plan was in effect in April 2022, when Defendant Musk and Twitter entered into the Merger Agreement, and it was in effect as of October 2022, when Defendant Musk acquired the company.

45.47.  Section 6.9 of the Merger Agreement provided that for one year following the closing of the merger, Twitter would continue to provide Plan participants with "Severance payments and benefits . . . no less favorable than" those provided ~~under Twitter's policies immediately~~ prior to the merger. The benefits provided prior to the merger were governed by the Twitter Severance Plan.

46.48.  The same day the Merger Agreement was announced, Twitter's then-CEO, Parag Agrawal, and its then-Chairman, Bret Taylor, met with all Twitter employees and informed them that the Merger Agreement required Twitter to continue to provide ~~Twitter Severance Plan~~the same severance benefits for at least one year following the change in company ownership.

~~47.    These same promises were made publicly in a letter, also filed with the Securities and Exchange Commission, to Twitter stockholders encouraging them to approve the Merger Agreement.  Referring to "Twitter benefit plans," this document explained that "[d]uring the one year period following the effective time of the merger, Parent [X Holdings] will, or will cause the surviving corporation [X Corp.] or any of their affiliates to, provide severance payments and benefits to each continuing employee that are no less favorable than those applicable to the continuing employee immediately prior to the effective time of the merger under the existing arrangements providing compensation or employee benefits." The letter also explained that any~~

1  ~~vested RSUs would immediately convert into payments of $54.20—Defendant Musk's offer~~

2  ~~price—while any unvested RSUs would convert "into the right to receive an amount in cash" equal~~

3  ~~to Defendant Musk's offer price, which would "vest and be payable" according to the same~~

4  ~~schedule as applied immediately prior to the merger.~~

5       49.    ~~On information~~ The promise that the severance benefits would continue after the

6  merger was also made in a public letter filed with the Securities and Exchange Commission.

7       50.    During company-wide, all-hands meetings between April and October 2022,

8  executives addressed employees' concerns about the uncertain future of the company post-merger

9  by promising them that the then-existing severance plan benefits would remain available if

10 employees were laid off after the merger.

11      51.    Plaintiffs Bhushan, Kurtz, and Ye attended all-hands meetings along with other

12 employees and ~~belief, in response to employee inquiries regarding the continued administration of~~

13 received these assurances from Twitter executives.

14

15      ~~48.~~    The promise to continue providing severance benefits, ~~Twitter created the first~~ was

16 reiterated in "Acquisition FAQs" ~~document, which the company distributed~~ sent to employees in

17 April, June, and October 2022~~.~~

18      52.    ~~On information and belief, Defendant Musk approved the~~ which promised that the

19 existing severance benefits would continue post-merger. The Acquisition ~~FAQ, which~~ FAQs

20 summarized some—but not all—components of the Twitter Severance Plan~~, and its~~.

21      ~~49.~~ 53. Defendant Musk approved the Acquisition FAQs and their distribution to

22 employees.

23

24      ~~50.~~ 54. ~~The company~~ Between the announced merger in April 2022 and Musk's takeover

25 in October 2022, Twitter regularly updated the Acquisition FAQs document with information

26 about the merger, including ~~details about and promises~~ the promise to continue existing severance

27 benefits. These updates were distributed to employees with Defendant Musk's approval.

28

51.55.  The October 2022 Acquisition FAQs encouraged employees to rely on communications from the company and Defendant Musk for information about the merger and future company ~~policy~~policies.

52.56.  The Acquisition FAQs ~~expressly~~ cited, quoted, and referred employees to Section 6.9 of the Merger Agreement, stating that the section "provide[d] special protection for Tweep [Twitter employee] compensation and benefits for one year following the close of the transaction." The Acquisition FAQs went on to state: "Specifically, the agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will . . . Provide continuing Tweeps whose employment [is] terminated during such period with severance payments and benefits that are no less favorable than those applicable to an applicable employee prior to the closing of the transaction." ~~This language is the same as Section 6.9 of the Merger Agreement~~The severance benefits participants were eligible for prior to the closing of the transaction were the benefits detailed in the Twitter Severance Plan.

53.57.  The Acquisition FAQs ~~also~~ reinforced ~~that Twitter employees would receive Plan benefits as detailed in~~ the ~~long-existing~~ existence of the Twitter Severance Plan ~~planning documents under the heading,~~and the fact that it would remain available to employees after the merger. In "What is our general severance package if a position is eliminated?" The Acquisition FAQ update from October 24, 2022, ~~stated~~summarized some of the Twitter Severance Plan components available for a certain type of separation for lower-level employees: "Generally speaking, in the event of a position elimination our current severance package includes . . . at least . . . two months base salary or On Target Earnings for employees on the Sales Incentive Plan; Pro-Rated Performance Bonus Plan compensation at target; Cash value of equity that would have vested within three months from the separation date; A cash contribution for health care continuation."

54.    The Acquisition FAQs summarized certain components of, and provided further evidence of the existence of, the Twitter Severance Plan.

55.58. On information and belief, Defendant Musk approved a similar descriptionsummary of the Plan and some of its constituent partscomponents that was sent to employees in a company-wide email in May 2022.

56.    As communicated to employees in this email, the severance components included at least: two months base salary, prorated performance bonuses, payment for any RSUs vesting within three months of separation, and a cash contribution for continued healthcare coverage. These components are the same as some of the components of the severance package that would result from application of Plan documents such as the Matrix.

57.    On information and belief, given the widespread skepticism of Defendant Musk's ability to operate Twitter successfully and the tightening of the tech labor market overall at the time, the parties to the Merger Agreement—Defendant Musk and the incoming leadership, as well as Twitter's outgoing management—knew that promising continued Twitter Severance Plan benefits was necessary to prevent mass resignations that would threaten the viability of the merger deal and, potentially, of the company itself.

**C.    Starting in October 2022, Defendants Failed to Fund the PlanDiscussed Layoffs and Pay PlanPlanned to Deny Benefits to Plan Participants**

58.    Defendant Musk assumed control of Twitter and the Plan in October 2022.

59.    Upon taking over Twitter on October 27, 2022, Defendant Musk dismissed Twitter's executive leadership and Board of Directors, and Defendant Musk became the sole director and CEO of the company.

60.    With the assistance and input of the Doe Defendants, Defendant Musk immediately began widespread layoffs, which came in four large rounds: one in November 2022, two in December 2022, and one in February 2023, along with additional mass firings.

61.59. On information and belief, in the weeks prior to the November 4, 2022 layoffsAfter

the merger, Defendant Musk and the Doe Defendants met with Twitter human resources officials to discuss the layoffs.

62.60. On information and belief, atAt these meetings, the Twitter human resourcesresource officials repeatedly told Defendant Musk and the Doe Defendants that (a) laid-off employees would be eligible for severance, and that (b) Twitter wasthe company had obligated itself to pay severance according toTwitter Severance Plan benefits, via the Merger Agreement and the representations the companypromises made in the Acquisition FAQs, all of which Defendant Musk had approved.

63.61. At these meetings, Twitter (now X Corp.),, Defendant Musk, and/or the Doe Defendants exercised complete control over the Plan and the forthcoming severance to be offered to terminatedlaid-off employees.

**D.    Defendants Failed to Provide Plan Participants with Truthful and Accurate Information about Benefits**

64.62. At no point did Twitter, Defendant Musk, the Doe Defendants, or anyone with control or discretion over the Plan inform employees of any anticipated changes to the Twitter Severance Plan.

65.63. In fact, management communication with Plan participants regarding severance had largely gone silent since Defendant Musk's takeover, and Twitter did not respondhad mostly stopped responding to inquiries from Plan participants about their severance benefits.

66.64. Plan participants were left in the dark regarding the severance benefits they had been repeatedly promised.

67.65. Public reporting suggests that, whereas prior to before the merger Twitter would transparently address employee questions about company policies (such as severance benefits) raised via the communication platform Slack, after. After the merger and around the time of impending layoffs, Defendants occasionallythe Slack channel was shut down Twitter's Slack

Case No. 3:25-cv-9501-PHK

entirely, seemingly to prevent potentially affected employees from seeking information and asking about or communicating among themselves about their benefits.

68.66.  Twitter also quietly shut down the email address employees could previously use for human resources inquiries.

69.67.  It has been reported that Twitter told some Plan participants to view Defendant Musk's personal Twitter account or listen to episodes of the "All In" a podcast, hosted by Defendant Musk's friends Jason Calacanis and David Sacks, for information about the layoffs and changes to company policies such as the Twitter Severance Plan.

70.    On November 4, 2022, Twitter fired approximately 3,700 employees, including Plaintiffs Ye and Kurtz.

71.    On December 16 and 22, 2022, Twitter further laid off employees in its public policy and infrastructure teams.

72.    On February 25, 2023, Twitter laid off an additional approximately 200 employees, or 10% of its remaining workforce.

73.    On September 27, 2023, it was publicly reported that Twitter laid off around half of the Election Integrity Team.

74.    On information and belief, Twitter has terminated at least 4,000 employees since Defendant Musk's takeover, significantly reducing the company's workforce.

68.    Defendants failed to pay any of At no point before the merger did the company suggest or indicate that it had any understanding or interpretation of the Twitter Severance Plan that would allow it not to pay Twitter Severance Plan benefits to Plan participants who were laid off following the merger.

69.    Twitter knowingly and intentionally failed to inform Plan participants of its intent to not pay Plan benefits to Plan participants who were terminated following the merger.

70.    On information and belief, given the widespread skepticism of Defendant Musk's

ability to operate Twitter successfully and the tightening of the tech labor market overall at the time, the parties to the Merger Agreement—Defendant Musk and the incoming leadership, as well as Twitter's outgoing management—knew that promising continued severance benefits was necessary to prevent mass resignations that would threaten the viability of the merger and, potentially, of the company itself.

71.    On information and belief, Defendants knowingly and intentionally disseminated summary information about the Plan to encourage Twitter employees to remain at Twitter rather than pursuing other employment opportunities with the intent of causing Twitter employees (and Plan participants) to rely on these representations about the purported continuation of the Plan after the acquisition.

**E.    Defendants Laid Off Thousands, Failed to Pay Severance Benefits, and Attempted to Induce Employees Into Signing a Release for a Vastly Reduced Payment**

72.    Defendant Musk assumed control of Twitter and the Plan in October 2022 when he became sole director and CEO of the company.

73.    Since November 4, 2022, Twitter laid off more than 4,000 employees, including Plaintiffs Ye, Kurtz, and Bhushan.

74.    Defendants failed to pay these employees the severance benefits they were entitled to under the Plan. Despite the fact that all of the employees terminated in the wake of Defendant Musk's takeover were eligible for benefits

75.    Instead of paying severance benefits owed under the Plan, Defendants offered laid-off employees one month of pay (significantly less than the Twitter Severance Plan benefits) in exchange for a broad release of claims ("Release").

75.76.  Defendant Musk wrote on his Twitter account on November 4, 2022 that terminated employees were receiving "50% more than legally required." The contents of this post were widely reported.

Case No. 3:25-cv-9501-PHK

AMENDED COMPLAINT

20

77.    ~~In fact,~~ On information and belief, Twitter and Defendant Musk knew that this statement was false in light of employees' entitlements to benefits under the Plan.

78.    Defendants largely ignored former employees' questions about the severance benefits or the Release, so former employees were left with only Defendant Musk's untruthful statement seemingly intended to convince them that they were not entitled to the Twitter Severance Plan benefits and that they should sign the Release.

79.    Plaintiffs Kurtz and Ye signed the Release and received one month of pay, significantly less than the Twitter Severance Plan benefits they were entitled to.

80.    Musk's statement aimed to convince employees they were entitled to only one month of pay. Plaintiffs Kurtz and Ye were not afforded an opportunity knowingly and voluntarily release their ERISA claims because Defendants did not provide them accurate and complete information about the Plan, their severance benefits, or their ERISA rights.

**F.    Defendants Have Unjustly Enriched Themselves by Denying Severance Benefits**

~~76.    Twitter offered the~~ terminated employees ~~one month of severance compensation. Defendant Musk appears to have been referring to the two-month notice period required under the Worker Adjustment and Retraining Notification Act.~~

~~77.~~81.  ~~The severance Twitter has offered to date is~~ only one month of base pay ~~—~~ a fraction of only one part of what ~~employees are entitled to as~~ Plan participants. ~~On information and belief, the terminated employees remain entitled to no less than $500 million.~~ were entitled to.

~~78.    On information and belief, the~~The base salary severance component under the ~~Twitter~~ Severance Plan is six months' base pay plus one week for each full year of service for senior employees, and less senior employees are entitled to two months' base pay plus one week for each full year of service.

~~79.~~82.  In addition, employees are entitled to their RSUs, bonuses, a cash contribution for health insurance, and three ~~to~~or six months of outplacement services.

80.83.  As a Level-4/Level-5 employee with just under a year of tenure at Twitter, Plaintiff Ye was entitled under the Twitter Severance Plan to two months' pay, a lump sum payment equal to the cost of three months of continuing health insurance coverage, three months of outplacement services, and the value of any RSUs that vested within three months of her termination, in addition to any bonuses, prorated to the time of termination.

81.    Twitter offered Plaintiff Ye severance equal to one month of pay in exchange for signing a general release of claims. This amount of severance was substantially less than she was entitled to under the Twitter Severance Plan.

84.    As a Level-5/Level-6 employee with over two years' tenure at Twitter, Plaintiff Kurtz was entitled under the Twitter Severance Plan to two-and-a-half months pay, a lump sum payment equal to the cost of three months of continuing health insurance coverage, three months of outplacement services, and the value of any RSUs that vested within six months of his termination, in addition to any bonuses, prorated to the time of termination.

82.85.  As a Level-6/Level-7 employee with over six years' tenure at Twitter, Plaintiff Bhushan was entitled under the Twitter Severance Plan to two-and-a-half months pay, a lump sum payment equal to the cost of three months of continuing health insurance coverage, three months of outplacement services, and the value of any RSUs that vested within six months of herhis termination, in addition to any bonuses, prorated to the time of termination.

83.    Twitter offered Plaintiff Kurtz severance equal to one month of pay in exchange for signing a general release of claims. This amount of severance was substantially less than he was entitled to under the Twitter Severance Plan.

84.86.  On information and belief, the Twitter did not provide the fullSeverance Plan benefits owed under the Plan to any Plan participants pursuant to orders from Defendant Muskto which the laid off employees were entitled totals at least $500 million.

85.87.  On information and belief, Defendants withheld information and misled employees

about severance benefits, failed to ensure the Plan had access to sufficient funds to pay severance benefits, and decided to deny severance benefits because of the cost to Twitter (and ultimately Musk as the owner of Twitter). Defendants knowingly and intentionally failed to inform Plaintiffs and other terminated employees about the existence of the Twitter Severance Plan, that they had rights under ERISA as beneficiaries of the Plan, and that they were entitled to substantially greater benefits than Twitter was offering them. ~~Indeed, Defendant Musk falsely claimed that terminated employees were receiving "50% more than legally required."~~

88.    Defendants used the lure of severance benefits to ensure stability during the merger and then denied benefits after the merger to enrich themselves by avoiding the cost of severance benefits. This violates Defendants' fiduciary duties, which require fiduciaries to act solely in the interest of Plan participants.

### CLASS ACTION ALLEGATIONS

**I.     Proposed Class and Subclass Definitions**

~~86.~~89.  Section 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a). Section 1132(a)(3) authorizes any participant or beneficiary to enjoin any act or practice that violates any provision of ERISA or the terms of the plan or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan.

~~87.~~90.  In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Twitter Severance Plan on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. ~~Specifically, Plaintiffs seek to certify, and to be~~

appended as representatives of, the following class:

91.    Specifically, Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

All participants and beneficiaries of the Plan who were terminated from Twitter since the date of Defendant Musk's takeover, October 27, 2022, through the date of judgment.

92.    Additionally, Plaintiffs Ye and Kurtz seek to represent members of the Class who signed releases from Twitter upon their termination (Subclass 1). Plaintiffs Ye and Kurtz seek to certify and to be appointed representatives of Subclass 1 within the above Class.

93.    Plaintiff Bhushan seeks to represent members of the Class who did not sign releases from Twitter upon their termination (Subclass 2). Plaintiff Bhushan seeks to certify and to be appointed representative of Subclass 2 within the above Class.

## II.    Rule 23 Requirements

88.94.  This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

### A.    Numerosity

89.95.  The Class includes thousands of members and is so large that joinder of all its members is impracticable.

96.    Each Subclass includes hundreds or thousands of members and is so large that joinder of all members is impracticable.

### B.    Commonality

90.97.  There are numerous questions of law and fact common to this Class because the Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and

took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. ~~Thus, questions of law and fact common to the Class include, without limitation, the following: (i) whether Twitter's Severance Plan is an employee welfare benefit plan as that term is defined in 29 U.S.C. § 1002; (ii) whether each of the Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); (iii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by misleading Class members about their eligibility for severance and by denying Plan benefits to Plan participants; (iv) whether Plaintiffs' claims require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class; and (v) what Plan-wide equitable and other relief the Court should impose in light of the Defendants' breach of duties~~These common questions predominate over any questions affecting only individual proposed Class members.

98.    Questions of law and fact common to the Class include, without limitation:

(i)    Whether Twitter's Severance Plan is governed by ERISA because it is an employee welfare benefit plan as that term is defined in 29 U.S.C. § 1002.

(ii)    Whether each of the Defendants are fiduciaries and thus liable for the remedies provided by 29 U.S.C. § 1109(a).

(iii)    Whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by:

    a.    misleading Class members about their eligibility for severance;

    b.    denying Plan benefits to Plan participants to benefit themselves at the expense of Plan participants;

    c.    attempting to coerce Plan participants to accept only a portion of the severance benefits to which they were entitled under the Plan, despite knowing that Plan participants were entitled to 100% of Plan benefits;

d.  attempting to coerce Plan participants to sign a release of claims against Defendants in exchange for a portion of the severance benefits to which they were entitled under the Plan, despite knowing that Plan participants were entitled to 100% of Plan benefits; and

e.  knowingly making false and misleading representations to Plan participants before the Merger Agreement was finalized that Twitter would honor the terms of the Plan, thus causing Plan participants to believe that they would be entitled to the full amount of benefits provided by the Plan if they continued their employment until after the merger.

(iv)   What Plan-wide equitable and other relief the Court should impose in light of the Defendants' breaches of duties.

99.   In addition to the common questions listed above, questions of law and fact common to Subclass 1 include, without limitation:

(i)   Whether the fiduciaries' acts and omissions detailed in Paragraph 99(iii) prevented Plan participants from being able to knowingly and voluntarily execute a release of claims in exchange for less severance benefits than they were entitled to under the Plan.

**C.   Typicality**

~~91.~~100.   Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were Plan participants during the Class Period and all participants in the Plan were harmed by Defendants' misconduct.

101.   Plaintiffs Ye and Kurtz's claims are typical of the claims of Subclass 1 because Plaintiffs Ye and Kurtz signed releases of claims in reliance upon Defendants' knowing and intentional misrepresentations.

102.    Plaintiff Bhushan's claims are typical of the claims of Subclass 2 because he did not sign a release of claims.

**D.    Adequate Representation**

~~92.~~103.    Plaintiffs are adequate representatives of the Class because they participated in the Plan during the Class Period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys experienced in handling class action and complex litigation to represent the Class.

~~a.    There are no substantial individualized questions of law or fact among Class members on the merits of this Action.~~

**E.    ~~Prosecution~~Appropriateness of Class Treatment**

~~93.~~104.    This action should be certified as a class action under Rule 23(b)(1)(A) or (B) because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants in respect to the discharge of their fiduciary duties to participants and beneficiaries and to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. ~~Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).~~

~~94.~~105.    Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate in

respect to the Class as a whole.

95.106.    Additionally, or in the alternative, this action may be certified as a class action under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by some individual participants and beneficiaries may be small and it may be impracticable for all individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no classClass member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

96.107.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Defendants' liability to the Class for their disloyal conduct.

97.108.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

**COUNT I**
**Denial of Benefits**
**29 U.S.C. § 1132(a)(1)(B)**
Against All Defendants by the Class (including Subclass 1 and Subclass 2)

~~Breach of Fiduciary Duties by Failing to Fund the Plan~~
~~29 U.S.C. §§ 1104(a)(1) and 1132(a)(2)~~

98.109.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

99.110.    The Twitter Severance Plan is a "welfare benefit plan" under ERISA and pursuant to the provisions of 29 U.S.C. § 1002(1) and 29 U.S.C. § 186(c)(6).

100.111.    ~~Twitter administered the Plan and served as a fiduciary.~~ Beginning on or

Case No. 3:25-cv-9501-PHK

before October 27, 2022, Defendant Musk and the Doe Defendants began exercising discretion and control over the Plan and became functional fiduciaries.

112.    Starting on or before October 27, 2022, Defendants failed to provide Plan participants with the benefits they were entitled to under the Plan.

113.    The Plan was in effect for the entire duration of Plaintiffs' employment with Twitter and was in effect as of October 2022, when Defendant Musk acquired the company.

114.    In the days, weeks, and months before Defendant Musk's takeover, Twitter assured employees that severance benefits would continue and that employees who stayed on through the takeover would receive them in the event of layoffs. To this end, Twitter published company-wide the Acquisition FAQs summarizing some components of the Twitter Severance Plan in April, June, and October 2022. Twitter also sent a company-wide email in May 2022 summarizing the Plan.

115.    Twitter executives made similar promises in company-wide, all-hands meetings between April and October 2022.

116.    The October 2022 Acquisition FAQs encouraged employees to rely on communications from the company and Defendant Musk for information about the merger and future company policy.

117.    On information and belief, Defendants knowingly and intentionally disseminated summary information about the Plan between April and October 2022 to encourage Twitter employees to remain at Twitter rather than pursuing other employment opportunities and with the intent of causing Twitter employees (and Plan participants) to rely on these representations about the purported continuation of the Plan after the acquisition.

118.    Defendants failed to pay any Class members terminated in the wake of the merger the severance benefits they were entitled to under the Plan. Despite the fact that all of the employees terminated in the wake of Defendant Musk's takeover were eligible for benefits under

the Plan, and that Defendants knew that these employees were eligible for benefits under the Plan, Defendant Musk stated publicly on November 4, 2022 that terminated employees were receiving "50% more than legally required."

119. On information and belief, Twitter and Defendant Musk knew that this statement was false under the express provisions of the Plan.

120. Defendants knowingly and intentionally represented falsely to Twitter employees that they were not entitled to the full severance benefits provided by the Plan. Defendants have since knowingly and intentionally represented falsely that the Plan did not exist.

121. Defendants knowingly and intentionally failed to inform the terminated Twitter employees that the Plan was in existence and in effect, that the terminated Twitter employees had rights under ERISA as beneficiaries of the Plan (including rights to appeal any denial of a claim for ERISA benefits under the Plan), or that pursuant to the Plan and the statutory protections provided by ERISA, the terminated Twitter employees were entitled to substantially and materially greater benefits than Twitter was offering them. By these deliberate and knowing acts of omission and commission, Defendants breached their fiduciary duties under ERISA.

122. Plan participants reasonably relied on Defendants' knowing misrepresentations in signing separation agreements and releases in exchange for significantly less than they were owed under the Plan. Accordingly, Defendants knowingly and intentionally prevented Plan participants from having the opportunity to knowingly and voluntarily execute the release of their ERISA benefits claims.

123. Due to Defendants' failure to inform Plan participants of their rights under ERISA and their knowing, intentional, and malicious campaign to obfuscate the fact that Plan participants were entitled to benefits under the Plan, members of Subclass 1 were not afforded an opportunity to knowingly and voluntarily release their ERISA claims. *See Schuman v. Microchip Tech. Inc.*,

139 F.4th 1045, 1055–56 (9th Cir. 2025) ("In sum, we hold that releases and waivers under ERISA must 'withstand special scrutiny designed to prevent potential employer or fiduciary abuse.' *Vizcaino*, 120 F.3d at 1012. This scrutiny requires courts to consider whether the plaintiff entered into the release knowingly and voluntarily, and will be of particular importance where, as here, there is evidence that the defendant potentially breached its fiduciary duty by or in the course of obtaining a release of ERISA claims.").

124.    Because the Plan does not provide formal appeal procedures, and because Defendants have not acknowledged that any severance plan exists, it would be futile to pursue the exhaustion of any administrative remedies.

125.    Plaintiffs and all members of the proposed Class are therefore entitled "to recover benefits due to [them] under the terms of [the] plan." 29 U.S.C. § 1132(a)(1)(B).

126.    As such, Plaintiffs and all members of the proposed Class are entitled to these benefits, plus pre- and post- judgment interest, costs, attorneys' fees, and penalties as authorized by 29 U.S.C. § 1132(g).

~~101.~~127.    As the Plan sponsor and administrator, X Corp. (formerly Twitter) is liable under Count I.

~~102.~~128.    Defendant Musk is also personally liable due to the unity of interest and ownership that existed, and continues to exist, between Defendant Musk and Twitter.

129.    Defendant Musk has substantially ~~commingled~~comingled his own assets and other businesses with Twitter and repeatedly failed to observe the strictures of the corporate form.

~~103.~~130.    It was recently reported that Defendant Musk used his position as controlling shareholder of X Corp. to sell X to his other company, xAI, where he is also the controlling shareholder. It is reported that this mixing of corporations increases his on-paper valuation by $66.4 billion.

104.131.        It has been widely reported that Defendant Musk has conscripted employees from his other companies, as well as friends and family, to do work at and for Twitter. ~~This would enable Twitter to continue functioning despite mass layoffs without any risk of having to pay the severance benefits to the conscripted employees.~~

105.132.        According to public reports, Defendant Musk financed his purchase of Twitter in part through a billion-dollar loan from one of his other companies, SpaceX.

106.133.        According to public reports, Defendant Musk also financed his purchase of Twitter, and paid back his loan from SpaceX, by selling his stocks in another one of his companies, Tesla.

107.134.        Moreover, to the extent X Corp. finds itself in a state of financial precariousness and unable to meet its obligations to the Plan, it is the direct result of the debt Defendant Musk loaded on to the company through the inflated price that Defendant Musk offered for the company.

108.135.        By setting the purchase price and agreeing to the terms of the Merger Agreement, Defendant Musk also set the price for the RSU shares that were ~~promised~~owed to terminated employees, but which he and the other Defendants now refuse to pay.

109.136.        For the Plan and Plan participants to be deprived of the full value of their ~~promised~~owed severance~~, at prices Defendant Musk himself set,~~ because of potential corporate insolvency that Defendant Musk himself caused~~,~~ would be inequitable.

110.137.        ~~Starting in~~Since October 2022, Defendant Musk ~~was sole owner and CEO of Twitter, and acted with unchecked discretion and~~has exercised immense control over ~~nearly every aspect of the company~~Twitter, serving at various times as CEO, Chief Technology Officer, and Executive Chairman all while maintaining ownership control.

111.138.        According to publicly filed documents and his own representations,

Defendant Musk purchased Twitter and took the company private primarily for personal and political reasons, including the views on free speech held by Defendant Musk and others close to him. ~~Defendant Musk also failed to effectuate the Plan in the best interests of the Plan and Plan participants.~~

~~112.~~139.    Defendant Musk and Twitter publicly presented themselves as each other's alter egos: Defendant Musk routinely used his personal Twitter account to propose and announce changes in company policy, including hiring and firing decisions, and official Twitter communications described the company as "Twitter 2.0: an Elon company."

~~113.~~140.    ~~On information and belief,~~Former Named Plaintiff Courtney McMillian previously alleged that she was informed the decision to deny employees' severance was made by Defendant Musk after Defendant Musk and the Doe Defendants reviewed the numbers on how much paying the severance would cost the company. It would be inequitable and unjust to prevent the Plan and Plan participants from recovering benefits and remedies from the person most responsible: Defendant Musk.

141.    Defendants are jointly and severally liable for the denial of benefits to Plan participants.

**COUNT II**
**Breach of Fiduciary Duties by Failing to Fund the Plan**
**29 U.S.C. §§ 1104(a)(1) and 1132(a)(2)**
Against All Defendants by the Class

142.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

~~114.~~143.    The fiduciary duties imposed by 29 U.S.C. § 1104(a)(1)(A)(i) ~~require~~requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants                                                    and beneficiaries and for the exclusive purpose of providing benefits to participants and their

beneficiaries."

115.144.    The Merger Agreement required Twitter and Defendants to pay severance benefits under the Severance Planplan that was then in effect for one year from the date of Defendant Musk's purchase of Twitter.

116.145.    The Merger Agreement thus created an obligation that the Twitter Severance Plan be sufficiently funded to pay benefits to all participants who qualified for benefits under the terms of the Plan.

117.146.    Instead of fulfilling their obligations under the Plan and their fiduciary obligations to the Plan, Defendants secretly disemboweleddecided not to direct company funds towards the Plan and its componentsowed severance benefits, leaving the Plan unable to make promised payments owed to participants.

118.147.    All Defendants are liable under Count IIII. Defendant Musk and the Doe Defendants are personally liable as fiduciaries of the Plan who failed to fund the Plan as required, instead likely diverting Plan funds to other company expenses to the detriment of participants and beneficiaries. Defendant Musk and Doe Defendants also made the decision to deny participants the outplacement services provided by the Plan, resulting in unnecessary expenses to the Plan. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter, a fiduciary and sponsor of the Plan. Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

**COUNT II**
**COUNT III**
**Breach of Fiduciary Duties by Failing to Provide Complete and Accurate Information**
**29 U.S.C. §§ 1104(a)(1) and 1132(a)(3)**
Against All Defendants by the Class (including Subclass 1 and Subclass 2)

119.148.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

120.149.    The fiduciary duties imposed by 29 U.S.C. § 1104(a)(1) include a duty of loyalty and a duty to communicate truthfully and accurately with plan participants and beneficiaries about the plan. This includes a duty not to mislead plan participants and beneficiaries about the plan and its benefits. It also includes a duty to inform plan participants when changes to a plan are under "serious consideration." *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1180–82 (9th Cir. 2004). Relatedly, a fiduciary has an affirmative duty to disclose any information about a plan that would be harmful to withhold, in light of the fiduciary's knowledge about a participant's situation. *Barker* *See King* v. *Am. Mobil Power Corp.*, 64 *Blue Cross & Blue Shield of Illinois*, 871 F.3d 1397, 1403 730, 744 (9th Cir. 1995 2017).

121.150.    As alleged above, between April and October 2022, and after the merger, the Defendants communicated extensively with Twitter employees about upcoming layoffs, their eligibility for severance, and the amount and form that severance would take.

122.    With each communication, Defendants misled Plan participants about their eligibility.

123.151.    Defendants approved the Acquisition FAQs sent to employees informing them of certain components of the Plan.

124.152.    In meetings prior to the November 4, 2022 layoffs, on information and belief, Defendant Musk and the other individual Defendants were planning to proceed with mass layoffs without abiding by the Plan.

125.153.    Yet Defendants made no efforts to disclose to Twitter employees that any changes to the Twitter Severance Plan were under serious consideration.

126.154.    On information and belief, employees Employees asked the Defendants specifically about the Plan and their eligibility for severance at various times leading up to and following the layoffs.

127.155.        However, Defendants engaged in a campaign of obfuscation to hide the existence of the Plan; to mislead participants about the Plan's content and employees' eligibility for benefits under the Plan; and to mislead participants about the amount of benefits they were owed and would be offered.

128.156.        On information and belief, ratherRather than candidly respondresponding to employee inquiries about the Plan or other work policies, Defendants instructed employees to view Defendant Musk's personal Twitter account and listen to episodes of the "All In"Defendant Musk's friends' podcast.

129.157.        By directing employees to podcasts and Twitter accounts instead of providing complete and accurate information about the Plan, Defendants failed in their fiduciary duties to disclose information.

130.158.        On information and belief, at no point following Defendant Musk's acquisition of Twitter did Defendants affirm the existence of the Plan, its components, or employees' eligibility for benefits under it. Nor did any Defendants notify Plan participants that any changes were under serious consideration, even though Defendants knew that participants were expecting benefits under the Plan, as Defendants had previously promised themto receive severance benefits consistent with Defendants' prior representations.

131.159.        When Twitter terminated employees, Defendants offered severance benefits to Plan participants that were substantially and materially lower in value than the benefits to which the employees were entitled as Plan participants. Defendants unlawfully and in breach of their fiduciary duties offered only those reduced benefits to Plan participants and only in exchange for a general release of claims against Twitter. Defendants knowingly and intentionally failed to inform Plaintiffs and other terminated employees about the existence of the Twitter Severance Plan, that they had rights under ERISA as beneficiaries of the Plan, and that they were entitled to

substantially greater benefits than Twitter was offering them under the Plan.

~~132.~~160.    The statements and communications regarding severance benefits were part of ~~Defendant Musk's~~Defendants' disloyal and dishonest strategy: to retain employees by making promises ~~of~~regarding the Plan's severance and then deny the Plan's existence when the employees were fired.

~~133.~~161.    These misrepresentations caused material harm to Plan participants. Employees received less severance than they were owed and were denied Plan benefits. Employees continued working at Twitter throughout the layoffs, understanding they would be eligible for severance benefits in the event of layoffs.

~~134.~~162.    Furthermore, Plaintiffs were irreparably harmed by being deprived of the Plan outplacement services designed to help employees recover professionally in the immediate aftermath of their termination.

~~135.~~163.    All Defendants are liable under Count ~~II~~III. Defendant Musk and the Doe Defendants are personally liable as fiduciaries of the Plan who misled, hid, or failed to disclose information about the Plan, including changes that were under serious consideration. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter/X Corp., a fiduciary and sponsor of the Plan. Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

**COUNT ~~III~~IV**
**~~Liability Pursuant~~Failure to Monitor**
**29 U.S.C. §§ 1105(a) and 1132(a)(3)**
Against All Defendants by the Class (including Subclass 1 and Subclass 2)

~~136.~~164.    The allegations set forth in the preceding paragraphs are realleged and incorporated herein by reference.

~~137.~~165.    As alleged above, all Defendants were fiduciaries who failed to monitor other Plan fiduciaries or non-fiduciaries who knowingly participated in the fiduciaries' breach of

duties.

138.166.    Section 1105(a) of Chapter 29 of the U.S. Code imposes liability on a fiduciary for another fiduciary's breach of a duty with respect to a plan if he or she (i) knows of such a breach and fails to remedy it, (ii) knowingly participates in a breach, or (iii) enables a breach.

139.167.    Section 1132(a)(3) imposes the same liability on non-fiduciaries.

140.168.    Pursuant to these provisions, Defendants are jointly and severally liable for each other's violations.

141.169.    Defendants knowingly participated and enabled Twitter's breach of its obligations under the Plan.

142.170.    Defendants knowingly participated and enabled the campaign of deceit surrounding the Plan and its benefits.

143.171.    To this day, Defendants have not done anything to remedy these breaches.

144.172.    All Defendants are jointly and severally liable under Count IIIIV as co-fiduciaries, or as knowing participants in other Defendants' violations of fiduciary duties. Defendant Musk is further personally liable due to the identity of interest between himself and Twitter, a fiduciary and sponsor of the Plan.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants as follows:

A.    An injunction prohibiting Defendants from enforcing Releases obtained through Defendants' breaches of fiduciary duties;

B.    Recovery of an equitable surcharge in an amount equal to the difference between what Defendants paid Plan participants in severance benefits and what Defendants should have paid them in severance benefits under the Plan;

C.    Payment of Severance Benefits owed under the Twitter Severance Plan;

A.D.    An order Compelling Defendants to abide by the requirements of ERISA with respect to the Twitter Severance Plan;

B.E.    An Order compelling Defendants to abide by the terms of the Twitter Severance Plan as described in the Matrix, and as summarized in the Acquisition FAQ,FAQs and other relevant documents;

C.F.    An Order compelling Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan;

D.G.    An Order enjoining Defendants from any further violations of ERISA, including their fiduciary duties prescribed therein;

E.H.    An Order requiring Defendants to fund the Plan in an amount sufficient to pay to Plan participants;

145.    Disgorgement of any excessive fees or amounts by which Defendants unjustly enriched themselves through the violations of their fiduciary duties;

F.I.    Find and adjudge thatAn Order Defendants Musk and Does are personally liable for losses to the Plan;

G.J.    Attorneys' fees and costs pursuant to ERISA § 502(g);

H.K.    Service awards for the named Plaintiffs in recognition of the time, effort, and risk they incurred in bringing this action and as compensation for the value they have provided to the classClass members; and

I.L.    An Order compelling Defendants to provide the full terms of severance according to the Plan to all employees terminated employees from the date of Defendant Musk's takeover of the company to one year from the date of execution of the Merger Agreement, an amount that is no less than $500 million, plus pre-judgment and post-judgment interest at the maximum legal

1   rate. Counsel for Plaintiffs demand a trial by jury.

2

3   DATED: ~~November 4, 2025~~January 30, 2026                    Respectfully

4   submitted,

5
                                          Sanford Heisler Sharp McKnight, LLP
6
                                          By:  ~~/s/Kate~~ /s/Kate
7   *Mueting*_____

8                                          Kate Mueting (D.C. Bar No. 988177~~)~~)*
                                          Shannon Henris (D.C. Bar No. 90017882~~)~~)*
9                                          ~~(*pro hac vice* applications forthcoming)~~
                                          ~~kmueting@sanfordheisler.com~~
10                                         ~~**SANFORD HEISLER SHARP**~~
                                          ~~**MCKNIGHT, LLP**~~
11                                         ~~700 Pennsylvania Ave SE, Suite 300~~
                                          ~~Washington, DC 20003~~
12                                         ~~Telephone: (202) 499-5206~~
                                          **SANFORD HEISLER SHARP**
13                                         **MCKNIGHT, LLP**
                                          700 Pennsylvania Ave SE, Suite 300
14                                         Washington, DC 20003
                                          Telephone: (202) 499-5206
15                                         kmueting@sanfordheisler.com
                                          shenris@sanfordheisler.com
16

17                                         Charles Field (CA Bar No. 189817)
18                                         ~~cfield@sanfordheisler.com~~
                                          **SANFORD HEISLER SHARP**
19                                         **MCKNIGHT, LLP**
                                          7911 Herschel Avenue, Suite 300
20                                         La Jolla, CA 92037
                                          Telephone: (619) 577-4252
21                                         cfield@sanfordheisler.com

22                                         Kristi Stahnke McGregor (GA Bar No.
23                                         674012~~)~~)*
                                          Dacey Romberg (TN Bar No. 036767) (*pro*
24                                         *hac vice* ~~application~~ forthcoming)
                                          ~~kmcgregor@sanfordheisler.com~~
25                                         **SANFORD HEISLER SHARP**
                                          **MCKNIGHT, LLP**
26                                         611 Commerce Street, Suite 3100
27                                         Nashville, TN 37203
                                          Telephone: (615) 434-7008
28                                                    Case No. 3:25-cv-9501-PHK

AMENDED COMPLAINT
40

kmcgregor@sanfordheisler.com
dromberg@sanfordheisler.com

Susannah R. Cohen (NY Bar No. 6048102))*
(*pro hac vice* application forthcoming)
**SANFORD HEISLER SHARP MCKNIGHT, LLP**
17 State Street, 37th Floor
New York, NY 10004
Telephone: (646) 402-5646
scohen@sanfordheisler.com

*Attorneys for Plaintiffs Diana Ye and, James Brian Kurtz, and Tushar Bhushan, on behalf of themselves and all others similarly situated*

*Admitted pro hac vice